IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SANDRA BULL,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        Case No. 06-0327-CV-W-REL-SSA
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
                Defendant.            )

## ORDER REVERSING THE DECISION OF THE COMMISSIONER
## AND REMANDING FOR FURTHER CONSIDERATION

Plaintiff Sandra Bull seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social

Security Act ("the Act").  Plaintiff argues that (1) the ALJ's residual functional capacity findings

were not included in his hypothetical to the vocational expert, (2) the ALJ's finding that plaintiff

could perform work as a surveillance system monitor is not supported by the evidence, and (3)

the ALJ's credibility finding is not supported by the evidence.  I find that the substantial evidence

in the record as a whole supports the ALJ's finding that plaintiff's testimony was not credible and

that plaintiff retains the mental residual functional capacity to perform the job of surveillance

system monitor. However, I find that the hypothetical relied on by the ALJ was improper as the

testimony of the vocational expert differed from the Dictionary of Occupational Titles with

respect to the level of reading ability.  Therefore, the decision of the Commissioner will be

reversed and this case will be remanded for further consideration.

## I.    BACKGROUND

On November 15, 2001, plaintiff applied for disability benefits alleging that she had been disabled since November 24, 1997, but later amended her alleged onset date to October 3, 2001 (Tr. at 18, 117-119).  Plaintiff's disability stems from Hepatitis C, major depression, personality disorder, knee problems, back problems, left shoulder pain, and chronic obstructive pulmonary disease ("COPD").  Plaintiff's applications were denied.  On January 13, 2004, a hearing was held before an Administrative Law Judge.  On January 24, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On February 14, 2006, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a

balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.　　Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.　　Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.　　Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.　　Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.　　Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.　THE RECORD

The record consists of the testimony of plaintiff and vocational expert Marianne Lumpe, in addition to documentary evidence admitted at the hearing.

## A.　EARNINGS RECORD

The record shows that plaintiff earned the following income from 1972 through 2004, shown in both actual and indexed figures.

4

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1972 | $ 1,799.90 | $ 6,233.38 |
| 1973 | 827.85 | 2,698.17 |
| 1974 | 502.81 | 1,546.83 |
| 1975 | 590.25 | 1,689.57 |
| 1976 | 0.00 | 0.00 |
| 1977 | 1,079.33 | 2,726.70 |
| 1978 | 1,237.35 | 2,895.93 |
| 1979 | 0.00 | 0.00 |
| 1980 | 403.42 | 796.48 |
| 1981 | 0.00 | 0.00 |
| 1982 | 0.00 | 0.00 |
| 1983 | 573.33 | 929.48 |
| 1984 | 0.00 | 0.00 |
| 1985 | 0.00 | 0.00 |
| 1986 | 397.50 | 566.94 |
| 1987 | 6,770.79 | 9,078.05 |
| 1988 | 6,238.60 | 7,971.88 |
| 1989 | 4,822.25 | 5,927.34 |
| 1990 | 0.00 | 0.00 |
| 1991 | 0.00 | 0.00 |
| 1992 | 2,342.87 | 2,523.70 |
| 1993 | 1,756.22 | 1,875.64 |
| 1994 | 6,498.39 | 6,758.87 |
| 1995 | 15,520.98 | 15,520.98 |

| | | |
|------|----------|----------|
| 1996 | 3,372.39 | 3,372.39 |
| 1997 | 8,348.92 | 8,348.92 |
| 1998 | 1,938.94 | 1,938.94 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |

(Tr. at 124-138).

## B.      SUMMARY OF MEDICAL RECORDS

On November 6, 2000, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up on her Hepatitis C (Tr. at 195-196).  Plaintiff stated that over the past couple of weeks she had noticed some right low and middle back discomfort, and she rated it a six out of ten.  She reported no nausea, fatigue, or malaise[1].  Plaintiff had been coughing more than usual. "She states she has not been using her inhaler and nebulizer as often as usual because she has run out of both. She does continue to smoke one pack per day of cigarettes."  She had not had anything to drink for three weeks.  She was seeing someone at Comprehensive Mental Health for rehab.  She missed her GI appointment that was scheduled for October 27, 2000, because she thought it was in November.  Dr. Hageman assessed right flank pain, possibly a urinary tract infection or right lower lobe pneumonia, Hepatitis C, chronic obstructive pulmonary disease -

---

[1]Malaise is a feeling of general discomfort or uneasiness, an "out of sorts" feeling, often the first indication of infection or other disease.

6

stable, and nicotine abuse. She ordered a urine analysis and chest x-rays. "Again, stressed the importance of smoking cessation."

Plaintiff's chest x-rays taken on November 6, 2000, were normal (Tr. at 197).

On November 27, 2000, during a visit with John Stanley, M.D., of Comprehensive Mental Health Services, plaintiff reported that she had previously had carpal tunnel surgery on her right wrist (Tr. at 223).

On December 29, 2000, plaintiff was seen in the Gastroenterology Clinic at Truman Medical Center (Tr. at 191-194). She reported smoking a pack of cigarettes per day, previously had heavy alcohol abuse but was currently drinking two to three beers per month. She reported she was a homemaker, and that she lived with her son and daughter. Plaintiff's tests were positive for Hepatitis C, negative for Hepatitis A and B. Her gait and station were normal; judgment, insight, time, place, and person orientation, recent and remote memory, and mood and affect were all normal. She was assessed with Hepatitis C, Anemia, Depression, and alcohol and tobacco abuse. "Patient strongly advised to quit alcohol/tobacco before treatment consideration."

On January 3, 2001, plaintiff saw Angela Fritzsch, an addiction counselor at Comprehensive Mental Health Services (Tr. at 218).

> Client shared that she drank on both Christmas Eve and New Year's Eve. She indicated that her mother had a heart attack on Christmas Eve and that she was very worried and drank a couple of beers. She reported that her mother is out of the hospital, is doing fine. . . . Client reported that she went for her scheduled biopsy but the doctor would not do anything because of the client's report of drinking on Christmas Eve. The biopsy is now scheduled for June. . . . Client indicated that hearing that her biopsy was not going to be until June contributed to her drinking on New Year's Eve. Client reported that she was at home on New Year's Eve and had people that were bringing alcohol to the house.

7

Although, she started out drinking Coca Cola, at some point during the evening, she stated "What the heck?" and started drinking. She indicated that she did get drunk. . . . Client indicated that she is not sure if she is at a point where she is ready to say that she will never drink again. Client also shared that there are a number of stressors that continue to be in her life such as the fact that her son still drinks. He is now living in the home with his girlfriend and the girlfriend's child. Her boyfriend is not working, money continues to be an issue, etc. When asked what her strategies were for dealing with these stressors, the client changed the subject. Client reports that she is not happy and was looking for the antidepressant to increase her level of happiness. She indicated that that had not been the case up to this point. She has been on the medications for over one month. We processed other ways that the client could increase her level of happiness and again the client changed the subject. Client appears reluctant to process issues which make her uncomfortable.

On January 11, 2001, plaintiff saw Angela Fritzsch, an addiction counselor at

Comprehensive Mental Health Services (Tr. at 217). "Client appeared to be in a better mood

during this individual session. She indicated that she has gotten back on her estrogen and thinks

this may be helping to regulate her moods. . . . Client indicated that she hadn't been feeling well

earlier this week and thought that the symptoms that she was experiencing, nausea and diarrhea,

were because of her Serzone (antidepressant). I provided the client an education sheet on

Serzone and it did not indicate diarrhea as a side effect. Client indicated that she would begin

taking her Serzone again this evening and would only take the prescribed two pills and not try to

make up for the days that she missed. We discussed that it's important for the client to maintain

on the medicine as prescribed and not start or stop without notifying a doctor or nurse in the

medication clinic. Client stated that she has not been drinking since our last individual session

and is quite proud of the fact that she has been able to abstain. We discussed the importance of

maintaining abstinence especially with her liver and kidney problems."

8

On January 17, 2001, plaintiff saw Angela Fritzsch, an addiction counselor at Comprehensive Mental Health Services (Tr. at 216). "The client indicated that she has been sober since our last session. This makes the last time of usage for the client New Year's Eve. The client indicated that her son had his court date yesterday and that he had a continuance until March 27. In the meantime, his probation officer has made some stipulation that he must enter a treatment program, etc., and Comprehensive is one of the programs. . . . She continues to struggle with wanting to maintain too much control over her son and stated that she would love to be able to 'cut the apron strings.' Although the client states this and in the same statement she indicates that she feels that she owes it to him to do his laundry, clean the house, cook his meals, etc. . . . She is very frustrated with the fact that [her significant other] is too sick to work and has not been approved for disability, therefore, he is bringing in no income."

On January 22, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up (Tr. at 189-190). She complained of right-sided flank discomfort. Plaintiff said she stopped drinking on Christmas day and has been having some problems with the flank pain since then. Plaintiff had her GI appointment in December 2000 and a liver biopsy was not done at that time because she had had two beers on Christmas Eve, after her mother had a heart attack. Plaintiff said that was the last time she had had a drink and planned to continue her cessation efforts. She said it was a daily struggle. Plaintiff reported that her breathing was stable with her Albuterol[2] inhalers. She continued to smoke one to one and a half packs of cigarettes per day. She was recently started on Serzone by her psychiatrist and said that was helping her

---

[2]Albuterol works by relaxing muscles in the airways to improve breathing.

9

sleep at night. "She feels better from that standpoint." Plaintiff's weight was 145 pounds. Her

lungs has scattered end expiratory wheezing which cleared with coughing. She had no

paraspinous muscle spasms or swelling. Dr. Hageman assessed right flank pain, chronic

obstructive pulmonary disease - stable, Hepatitis C, and nicotine abuse. She ordered a urine

analysis and abdominal ultrasound. "Again, readdressed the smoking problem. Stressed the

importance of her overall health and improvement in functioning." Plaintiff was encouraged to

continue her alcohol cessation. Plaintiff was reminded that her June 2001 liver biopsy would not

be done if she has any alcohol consumption. Finally, she recommended plaintiff stop using

Motrin and she gave plaintiff a trial of Celebrex (non-steroidal anti-inflammatory).

On January 23, 2001, plaintiff saw John Stanley, M.D., with Comprehensive Mental

Health Services (Tr. at 214). Plaintiff had stopped taking Serzone because of diarrhea, and she

had been off her replacement hormone for about a week. She reported continued use of alcohol.

Plaintiff said her mood was at about 50% of average and her energy was 0-25%. She reported

staying in the house much of the time, ignoring her houseplants. She was feeling flooded with

stress largely because of escalating utility bills and her mother's recent heart attack. "She has an

ongoing conflict with her son regarding leaving the toilet seat up." Dr. Stanley assessed plaintiff's

GAF at 65[3]. He increased plaintiff's Serzone.

---

[3]A Global Assessment of Functioning of 61-70 means some mild symptoms (e.g., depressed
mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally functioning pretty well, has
some meaningful interpersonal relationships.

On January 24, 2001, plaintiff saw Angela Fritzsch, M.A., an addiction counselor at Comprehensive Mental Health Services (Tr. at 213). "Client indicated that she feels that the anti-depressants are somewhat helpful up to this point and that her moods have been a little more stable in the past week or so. . . . Client shared that she has stayed clean since our last visit but that she is feeling an urge to 'tie one on'. We processed that she may benefit from thinking about the consequences of getting drunk. . . . Client also indicated that lately, she has been thinking about using methamphetamine because she has been feeling like she [is] trying to get a lot done around the house and would be more productive if she was high on methamphetamine. We processed the fact that this is short-term solution with potentially dangerous consequences since her health is in a fairly fragile state at this time. Client shared that situation at home is relatively unchanged. Her relationship with her significant other continues to be status quo and on the one hand, she expresses that she is not happy with the relationship. On the other hand, expresses that she doesn't know what she would do without him and is somewhat conflicted about taking any kind of action. Client also shared that her son's girlfriend has been staying over there fairly regularly because of lack of utilities in her own apartment and this involves not only her being there, but the two-year-old son. Client shares that she feels that she is often the one to take responsibility for picking up after the girlfriend and the girlfriend's son, cooking feeding, etc."

On January 30, 2001, Comprehensive Mental Health Services received a call from plaintiff's sister, Karla, who stated that plaintiff was intoxicated and threw herself down the stairs (Tr. at 208). "Karla reports that her sister has expressed she 'just wants to die'". Plaintiff refused

to come out of her room, was being belligerent and suicidal. The counselor told Karla that the Medical Crisis Response Team would be paged and arrangements would be made to have plaintiff transported to Truman Medical Center's emergency room.

After the counselor paged the MCRT, Michele Edwards from that team contacted plaintiff's son Alan (Tr. at 210-212). "Alan reported that Sandra was 'passed out' and had been sleeping for the past twenty minutes. Alan stated that he believed Sandra 'slipped down the stairs' and that it was not intentional. He also reported that her behavior was typical after drinking, and that she would 'be fine when she woke up.' . . . MCRT also urged Alan to take Sandra to the hospital to be checked out by a doctor but he insisted she would 'sleep it off.' . . . At 7:30p.m., MCRT contacted Sandra's home and spoke with Alan again. Alan stated Sandra just woke up but was still drunk. MCRT tried to speak with her but she was too intoxicated to understand or make conversation." An hour later, Ms. Edwards called again and Sandra agreed to speak with MCRT and denied suicidal thoughts or plans. She denied trying to hurt herself or that she told her sister she wanted to die.

On February 7, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up (Tr. at 187-188). Plaintiff had been having some right flank pain. Her ultrasound and urinalysis came back normal. Her pain was worse with certain movements and walking stairs. She was able to sleep at night and her pain was not there constantly. Plaintiff continued to smoke and had alcohol one time since her last visit after having a fight with her boyfriend who also has Hepatitis C. Plaintiff's weight was 148 pounds. Her lungs were clear to auscultation bilaterally, no wheezes or crackles were noted. There was tenderness to palpation in the right S1

area, a small amount of muscle spasms present, full range of motion at the hips.  Dr. Hageman

assessed low back pain, chronic obstructive pulmonary disease - stable, nicotine abuse, and

Hepatitis C.  She decided on "conservative management" for four to six weeks.  She told plaintiff

to continue using Motrin, ice, heat, and massage as needed.  She was given a prescription for

Vicodin (narcotic analgesic) for breakthrough pain.  "Again explained the importance for

stopping smoking [for] her overall well being.  No alcohol.  The patient is scheduled to have a

liver biopsy in June 2001, and this cannot be done if she has been drinking."

On February 12, 2001, plaintiff saw Angela Fritzsch, M.A., an addiction therapist at

Comprehensive Mental Health Services (Tr. at 209).  "Client shared that she recently relapsed

after having an altercation with her boyfriend.  Apparently the[y] had an argument and he left,

and she chose to get drunk.  Client indicated that she doesn't remember anything about the

specific events of that evening, but was told by family that she threw herself down the stairs. . . .

Client continues to focus on the many problems she has in her life, but has difficulty following

through on suggested solutions.  Client indicates that the boyfriend has now returned and she is

still struggling with the relationship.  Client did not show much insight into the reasons for

choosing to drink or any alternatives she might consider next time she finds herself in this

position.  Processed with client the fact that she has choices and that she needs to focus on

meeting her own needs and the choices she has to make in order to make herself happy."

On February 22, 2001, plaintiff saw John Stanley, M.D., at Comprehensive Mental

Health Services (Tr. at 207).  Plaintiff reported that she had been isolating herself in her

bedroom.  "She is continuing to use alcohol despite Hepatitis C. She complains of serious

problems with depression, crying, insomnia, poor appetite, irritability, mood swings and panic. She reports having twelve beers three days ago. Two weeks ago, while drinking vodka, she blacked out and fell down some steps." Plaintiff was diagnosed with dysthymia, history of polysubstance abuse and alcohol dependence with continuing use of alcohol, rule out generalized anxiety disorder, rule out post traumatic stress disorder. Plaintiff's GAF was 45[4]. Dr. Stanley increased plaintiff's Serzone with no refills and started her on BuSpar (for anxiety) with no refills.

On March 14, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for low back pain (Tr. at 185). Plaintiff had been experiencing this pain on the right side for the past four to five months, it was worse in the morning, improved when she drank more fluids. She said drinking caffeine and coffee made it worse. There were no specific positions that increased or aggravated her pain. Plaintiff said sometimes the pain would keep her awake at night. Plaintiff continued to smoke one pack of cigarettes per day, but she had abstained from alcohol. Dr. Hageman assessed low back pain, but questioned whether it was musculoskeletal. She also assessed chronic obstructive pulmonary disease, stable. She ordered lumbar spine films, a CBC, sedimentation rate, and a rheumatoid factor. She refilled plaintiff's Albuterol inhaler and Estrace (estrogen), told her to continue taking Motrin, and prescribed Vicodin for breakthrough pain.

Plaintiff's lumbar spine x-rays taken on March 14, 2001, showed moderate disc space narrowing at L1-2 and L5-S1 and mild to moderate narrowing at L4-5. She had a slight grade I

---

[4]A Global Assessment of Functioning of 41-50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

14

anterolisthesis[5] of L4 on L5.

On March 22, 2001, plaintiff went to Comprehensive Mental Health Services, but she left before being seen (Tr. at 200).

On March 26, 2001, plaintiff saw Angela Fritzsch, M.A., an addiction therapist at Comprehensive Mental Health Services (Tr. at 206).

> Client presented today after not being able to make it in for her previously scheduled appointments. Client indicated that she has been under a lot of stress lately and she had to cancel previous sessions. Client shared that she is currently in the process of moving out of her house and that she has until midnight of the 31st to be completely out. She shared this is extremely stressful for her and she is struggling to get everything packed and moved and also with the fact that she does not know where she'll be going as of Saturday. Client also shared that she moved her son to live with her daughter down south. She shared that her son got drunk one night and she finally kicked him out. Apparently the son and the son's girl friend were having some altercations and they broke up but are now back together. This is also a stress point for the client. Client stated that her drinking has been much better, that she only had two beers on St. Patrick's Day. Client reported, however, that her pot usage has increased quite a bit. We processed that the marijuana maintenance program is not a sufficient way to deal with stressors, and that since it is an illegal substance, she is putting herself at great risk for legal problems. Client seems to understand the connection, but continues to feel that she needs help dealing with the anxiety and tension. Client shared that she is still with her significant other, although she continues to struggle [with] whether or not to maintain that relationship.

Plaintiff was assessed with a GAF of 50 (see footnote 4). "Client is encouraged to maintain abstinence from all mood altering substances and to develop a plan of action to deal with the eviction from her home."

---

[5]The vertebrae are the bones that protect the spinal cord. Each vertebra has a thick drum-shaped area in front called a vertebral body. Between the vertebrae are spaces that allow nerves (nerve roots) to go from the spinal cord to other parts of the body. In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it. More specifically, the upper vertebral body slips forward on the one below.

15

On April 5, 2001, plaintiff saw John Stanley, M.D., at Comprehensive Mental Health Services (Tr. at 205). Plaintiff reported that she had not had alcohol for a month. She said her mood was at about 50% of average but with no energy. "She is now homeless, living wherever she can stay. She intends to get all of her teeth pulled. She apparently does not like BuSpar because of side effects. She attributed hearing people call her, and being dizzy and nauseated to BuSpar." Dr. Stanley assessed dysthymia, history of polysubstance abuse and alcohol dependence with continuing use of alcohol, rule out generalized anxiety disorder, rule out post traumatic stress disorder. Plaintiff's GAF was 40[6]. Dr. Stanley told plaintiff to discontinue BuSpar, continue the Serzone, and he gave her a prescription for Wellbutrin (antidepressant).

On April 17, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up (Tr. at 183). Plaintiff said she continued to have low back discomfort unchanged. Nothing specific increases or lessens her pain. Her pain was not throbbing, and she was able to sleep at night. Plaintiff did notice she was coughing more. She had no other problems. Plaintiff had switched to ultra light cigarettes and was smoking ten cigarettes per day, she had not had a drink in two months. Her weight was 149 pounds. Plaintiff was assessed with low back pain secondary to degenerative joint disease and L4/L5 anterolisthesis and acute bronchitis superimposed on chronic obstructive pulmonary disease. Dr. Hageman prescribed Vioxx (non-steroidal anti-inflammatory), Zithromax Z-pak (antibiotic), refilled plaintiff's Albuterol inhaler,

_____

[6]A Global Assessment of Functioning of 31-40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

and "stressed the importance of discontinuing smoking".

On May 17, 2001, plaintiff saw John Stanley, M.D., at Comprehensive Mental Health Services (Tr. at 203). Plaintiff reported that her mood was about 50% of average with virtually no energy, only slight improvement, continued to have significant difficulties with depression, crying, difficulty sleeping, reduced appetite, irritability, mood swings, and anxiety. Dr. Stanley assessed dysthymia, history of polysubstance abuse, alcohol dependence with continuing use of alcohol and marijuana, rule out generalized anxiety disorder, rule out post traumatic stress disorder. Plaintiff had a GAF of 40 (see footnote 6). He increased plaintiff's Serzone, increased her Wellbutrin, noted that plaintiff was under increased stress recently because of being homeless.

Later that day, plaintiff saw Angela Fritzsch, M.A., an addiction therapist at Comprehensive Mental Health Services (Tr. at 204).

> Client indicated that she moved out of her house as she has been planning on doing because of the house being sold. She indicated that in the meantime she and her SO [significant other] have basically just been staying here and there. Client shared that she does not like the feeling of being transient, living out of bags, having all of her belongings in storage, etc., but doesn't know what else to do at this point since she is not able to work regularly. Her SO is not working regularly either and they don't have any money to do anything else. Client continues to be unhappy and disappointed with the fact that her significant other is not working, but does not seem to be at a point where she is willing to make the decision to no longer be with him. Client shared that she has been doing well on her drinking, only having a couple beers last weekend, but that her smoking pot has increased. Typically, she smokes a couple times a week, but would smoke "as often as I can" if she had access to the marijuana. Client shared that her children continue to be a stressor in her life and that her daughter has been experiencing some problems since she is now living in the Kansas city area and may also be seeking treatment because of her history of marijuana usage. The client's son is also having difficulty maintaining any kind of stability and she worries that this may effect his probation status. Client recognizes that there are many stressors in her life, but has difficulty following through on making any changes to eliminate stressors.

Client is encouraged to continue taking medications as prescribed and work towards total abstinence of all mood-altering substances.

On August 7, 2001, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental Health

Services (Tr. at 202).

In the past, the patient has had symptoms of depression, disruptive sleeping pattern, irritability, mood swings, anxiety, worry, crying, feeling hopeless and helpless, trouble with concentration and memory. Today she tells me "I hate it when you make me change doctors. The same old crap (going on with the patient). I left my boyfriend five days ago. He came today and wants me back." This has been a very dysfunctional relationship according to the patient and she feels sorry for him and wants to take him back. "I've been doing good staying away from alcohol. I've been seeing things. For the last couple of months, I seen a ghost one night. Something catches my eye and startles me and it is not there. I'm still depressed and stressed out. I'm an unhappy camper." I asked about alcohol and she said, "I've been on it all my life. I've had none for a couple of month[s]. I'm getting ready for a liver biopsy because of Hepatitis C. I have a counselor, I go to bed at 10 and get up at 10." The patient tells me she naps during the day also. "I'm not happy. I'm stressed out, I cry because I have no life. All my stuff is in storage and I cannot get a place. I have a short temper and I take it out on others. I hear my daughter's voice yelling and she's not around and Karen died recently and I see her ghost. My boyfriend loves me, drinks, and does not work." Patient indicates she wants to take him back because she's lonely and feels like she needs somebody around. She is very self-defeating and she and I discussed these issues and indicated that only she can not defeat herself. . . .

Mental status examination is within normal limits. Patient apparently is seeing ghosts and hearing her daughter talk, however, these do not seem to be a real psychotic type of symptom and she is still withdrawing from alcohol. I will have to keep track of these things and I've discussed this with her. . . . We discussed the fact that she will need to be able to give up her self-defeating patterns of behavior, but she is getting ready to take back her boyfriend which she knows and admits would cause her problems. This is a very dysfunctional woman, who is very co-dependent and personality disordered.

18

Dr. Edmisten assessed dysthymia, polysubstance abuse in remission, alcohol dependence (active), alcohol abuse (active), borderline personality disorder, and a GAF of 50. He continued plaintiff on the same doses of Wellbutrin and Serzone.

On August 28, 2001, plaintiff had a liver biopsy done to evaluate disease activity regarding Hepatitis C infection (Tr. at 181).

On August 31, 2001, plaintiff saw Theresa Garcia, M.D., at Truman Medical Center (Tr. at 176). Plaintiff had been brought to the emergency room by ambulance complaining of chest pain. Plaintiff complained of pain in her right side, and stated she had a liver biopsy performed two days earlier. "Her history is difficult to get from the patient because she is breathing heavily, staring about the room in anxiety and sobbing in fear in the room. Her boyfriend and daughter accompany her. The boyfriend appears quite intoxicated and states only that she has been extremely irritable for the past 3 days, and he became frightened when she got so agitated over her chest pain. Her daughter states that she 'fell out' and kept on falling out until the ambulance arrived. The patient acknowledges drinking 3-4 beers, smoking 1 joint, and taking a friend's 5 mg of Valium." On exam, plaintiff was breathing rapidly, gasping for breath, sobbing, agitated, and staring wildly around the room. Her answers to questions were inarticulate. Her chest was clear to auscultation bilaterally. Dr. Garcia assessed noncardiac chest pain, chronic obstructive pulmonary disease, Hepatitis C, and alcohol abuse. Plaintiff was allowed to remain quiet in the exam room while awaiting the results of her tests, and her chest pain totally subsided, as did her anxiety.

19

On September 10, 2001, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental Health Services (Tr. at 201).

> Patient first asked about her disability forms, which are not in the chart and I have not seen these as I explained to her. "I've been doing good. . . . I got back with my boyfriend. I felt sorry for him. He is working now and cut [down] on his drinking. I'm hoping to come back to living in Independence next month. I'm living at 95th and Lydia in the wrong neighborhood. I stay at my sister['s] here two to three days a week and I'm anxious to move back. I think things have gotten better for me. (Boyfriend) he slowed down on his drinking. I still smoke and like my Coca Cola." The patient denies any drug or alcohol use herself. . . .

> The patient feels that the medications are working and the patient still has refills on these. Mental status examination is within normal limits and the patient denies any homicidal or suicidal ideas. She denies any hallucinations or delusions. She feels that she is progressing and doing much better at this time.

Dr. Edmisten assessed dysthymia, history of substance abuse, alcohol dependence, marijuana dependence, rule out post traumatic stress disorder, and borderline personality disorder. Plaintiff had a GAF of 60[7]. Dr. Edmisten continued plaintiff on Wellbutrin and Serzone.

On September 12, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up (Tr. at 174-175). Dr. Hageman noted that plaintiff had had persistent problems with chronic back pain, more so on the left side in the lumbar area, for the past six months. She went to physical therapy for two months with little relief. Her x-ray showed anterolisthesis. Plaintiff reported that her pain was worse after lying in bed for prolonged periods of time or days when she is very active and lifting a lot. Plaintiff rated her pain an 8 out of 10.

---

[7]A Global Assessment of Functioning of 51-60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Case 4:06-cv-00327-REL   Document 15   Filed 03/20/07   Page 20 of 58

Plaintiff reported that she had switched to light cigarettes but was smoking about a half a pack per day. She drinks about six beers at a time once a month. Plaintiff's weight was 154 pounds. Her lungs were clear to auscultation bilaterally, no wheezes or crackles were noted. Her back had no tenderness to palpation, full range of motion at the hips. Her strength was 5/5 diffusely. Dr. Hageman assessed Hepatitis C status post liver biopsy, L4-L5 anterolisthesis with chronic pain, chronic obstructive pulmonary disease, and nicotine abuse. Dr. Hageman referred plaintiff to an orthopedic specialist for her anterolisthesis, prescribed Vicodin, and recommended abdominal strengthening exercises. She "stressed the importance of stopping smoking and complete cessation of alcohol."

On October 1, 2001, plaintiff failed to show up for her appointment at Comprehensive Mental Health Services (Tr. at 200).

October 3, 2001, is plaintiff's amended alleged onset date.

On October 24, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up on her liver biopsy and lab results (Tr. at 172-173). Plaintiff reported that since her last visit, she had been feeling rather well. She did report having some intermittent days when her back bothered her. She was taking Vicodin on an intermittent basis. Plaintiff reported that she had not had any alcohol for two months. She was still smoking about a half a pack of cigarettes per day. Plaintiff's weight was 156. She rated her low back pain a nine out of ten. Her lungs were diffusely clear to auscultation bilaterally, no wheezes or crackles were noted. She had mild tenderness to palpation in the sacroiliac area, full range of motion in the hips. Mild pain with extension and flexion of the back. Her strength as 5/5. Plaintiff's liver function tests were

21

within normal limits except an AST of 38 with normal being 37.  Her liver biopsy showed

chronic hepatitis grade 1, stage 1[8].  Dr. Hageman assessed Hepatitis B (although this appears to

be a mistype since plaintiff's tests indicate Hepatitis C, not B), L4-L5 anterolisthesis with pain

(noting that plaintiff has failed two months of physical therapy and non-steroidal anti-

inflammatories), chronic obstructive pulmonary disease - stable, and nicotine abuse.  Dr.

Hageman referred plaintiff to an orthopedic specialist for her anterolisthesis, refilled plaintiff's

Vicodin, and "stress[ed] the importance of discontinuation of nicotine abuse."

On October 25, 2001, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental

Health Services (Tr. at 199).

> I asked the patient about the voices, which she marked on the problem sheet and she
> replied, "Someone calls my name out and no one is there.  I moved back to
> Independence.  A very stressful situation.  Why did I come back?  I can't get out of bed
> because my bed is on the floor.  I got denied on my disability.  My daughter was in here
> yesterday and they closed her out (closed the case - because the patient was non-
> compliant)."  I asked about mood swings and the patient says, "I'll be joyful one time and
> sad in the next few minutes.  I'm in a stressful situation.  I don't know if my utilities will
> be shut off or we will be kicked out of the apartment.  I just put a face on.  I'm not a
> happy camper.  I have not felt good lately."  I asked about anger and she says, "I had plans
> to give you an outburst today."  This is about her daughter and the fact that her daughter
> had been closed out of the program because of non-compliance. . . .  Also the patient is
> angry because she feels that myself and Dr. Stanley had something to do with her not
> getting disability.  "I'm angry because I'm in the same situation and it's not better.  I'm
> still with my boyfriend and should not be and everything he does pisses me off.  I feel
> sorry for him.  My daughter is rude to her boyfriend and I'm in the middle of it." . . .
>
> Mental status examination is within normal limits and the patient does indicate that she
> hears her name called out at time. . . .  She says, "If I skip my pills, the only one I miss is
> my Estrogen."  The patient denies any use of alcohol or drugs . . . .  The patient indicates
> that she has not learned any new habits in spite of her treatments.  This patient seems to

---

[8]The grade indicates the amount of inflammation.  The state indicates the amount of fibrosis,
or scarring.  Grade 1 means minimal inflammation.  Stage 1 means minimal scarring.

be very personality disordered to me and cannot learn by her experiences. We discussed the medications and the patient wanted to stop her medications and I have advised her not to stop her medicines at least all at once and have indicated to her that we will decrease the Wellbutrin and discontinue this by giving 75 mg q [every] five days and then discontinue it and follow her on the Serzone a while to see how she does. This patient is very impulsive and is likely to stop her medications and she has not been taking them correctly anyway and would have run out before.

Dr. Edmisten assessed dysthymia, polysubstance abuse in remission, alcohol dependence (active), alcohol abuse (active), borderline personality disorder, and a GAF of 60. He told her to take Wellbutrin 75 mg every morning for five days then stop taking it, he told her to take Serzone one in the morning and three at bedtime with no refills.

On December 12, 2001, plaintiff saw Heather Hageman, M.D., at Truman Medical Center, due to a lump on her back. She reported smoking 1/2 pack of cigarettes per day and "[h]as about 1 alcohol beverage per month since being diagnosed with Hepatitis C." Plaintiff's weight was 160 pounds. Her lungs were clear to auscultation bilaterally with no wheezes or crackles noted. Plaintiff was diagnosed with a lipoma[9] on her back. She was sent to the procedures clinic for excision of the lipoma, and was told to stop smoking.

On December 13, 2001, plaintiff had x-rays taken of her left and right knees which showed mild degenerative changes mainly within the lateral femoral tibial compartment (Tr. at 319-320).

On December 13, 2001, Dr. Blesinger completed a Physical Residual Functional Capacity Assessment at the request of Disability Determinations (Tr. at 230-237). Dr. Blesinger found that plaintiff could occasionally lift 20 pounds and frequently lift ten pounds, could stand or walk

---

[9]A lipoma is a common, benign tumor composed of fatty tissue.

23

for six hours per day, could sit for six hours per day, and had an unlimited ability to push or pull. In support of those findings, Dr. Blesinger noted that plaintiff continued to smoke but her chronic obstructive pulmonary disease remained stable nonetheless. Dr. Blesinger noted that plaintiff had only mild pain in her back with range of motion, she has a non-antalgic gait, and she stated in October 2001 that she was having some intermittent pain on occasion. The records contained no mention of pain or complaints about her knees or carpal tunnel. Plaintiff's Hepatitis C was grade one stage one, and her liver function tests were essentially normal. Dr. Blesinger found that plaintiff could occasionally climb, balance, stoop, kneel crouch or crawl. Dr. Blesinger found that plaintiff had no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations except that she should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and vibration.

On January 12, 2002, Martin Isenberg, Ph.D., a psychologist, completed a Mental Residual Functional Capacity Assessment (Tr. at 239-241). Dr. Isenberg found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

Dr. Isenberg found that plaintiff was moderately limited in the following:

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

Finally, Dr. Isenberg found no evidence of limitation in the following:

- The ability to understand and remember detailed instructions

- The ability to set realistic goals or make plans independently of others

In support of his findings, Dr. Isenberg wrote the following:

> This claimant's diagnoses include Dysthymia, Borderline Personality, and ETOH [alcohol] abuse and dependence. The claimant reports numerous situational stressors. However, over the past few months her mental status is described as "within normal

limits." She does report hearing her name called at times. Her ADLs [activities of daily living] include going to the store, doing household tasks, and preparing meals. She reports she can drive and has no difficulty leaving her home. Based on these data, the allegations "can't handle pressure and can't handle people looking at me" are partially credible. While she receives tx [treatment], her mental status is normal and her ADLs are not severely restricted. She may be hindered in demanding settings.

That same day, Dr. Isenberg completed a Psychiatric Review Technique (Tr. at 243-256). Dr. Isenberg found that plaintiff suffers from Dysthymia, Borderline Personality Disorder, and Substance Addiction Disorders. He found that plaintiff suffers from mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had no episodes of decompensation.

On January 22, 2002, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental Health Services (Tr. at 351). "I made it through Christmas and that was hell. My cousin shot himself and that stressed me out. I dreamed it was my son in that casket. I spent Christmas alone. That was hell. We celebrated the week before with my family. My boyfriend was mad at me and did not go to the family Christmas with me. Then he would not go to his family Christmas on Christmas day and I went. He was at home depressed. . . . I had a couple of beers New Years Eve but none before or since then." Plaintiff's mental status exam was within normal limits except she continued to hear voices and see things that were not there. Dr. Edmisten assessed dysthymia, history of substance abuse, alcohol dependence (active), marijuana dependence, and GAF 60. Her prescribed Serzone and increased plaintiff's Risperdal.

On January 25, 2002, plaintiff saw Heather Hageman, M.D., at Truman Medical Center (Tr. at 311). She reported she had stopped drinking completely but was smoking five to ten cigarettes per day. She was observed to be pleasant and in no acute distress; however, plaintiff

described her back pain, neck pain, and knee pain as a ten out of ten. Her weight was 159 pounds. "Recommended quad strengthening exercises. Use ice or heat prn [as needed], continue Vioxx 25 mg daily. Gave her a prescription for Vicodin 5/500 mg 1-2 po [by mouth] q [every] 4-6 h [hours] prn [as needed]. A total of 60 given. She has been given cortisone injections in the past and did not like these and does not wish to have these repeated in the future. I did discuss potential future course over the next several years that may eventually result in joint replacement. Encouraged her to stop smoking, not only to lessen the likelihood of percussion of her COPD but for her overall health in general."

On March 7, 2002, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up on her knee pain (Tr. at 307-308). Plaintiff reported that her knee pain was getting worse instead of better. "She does have a cane and a walker that she uses occasionally". Plaintiff reported she notices that if she does not take Vioxx, her knees hurt worse and swell. Plaintiff also reported using her albuterol inhaler more often and more shortness of breath. She had cut back a little on her smoking, but she was still smoking a half a pack per day. She reported that she had stopped drinking completely. Plaintiff's weight was 151 pounds. Dr. Hageman assessed Chronic obstructive pulmonary disease and severe degenerative joint disease bilateral knees. She prescribed Flovent "as a preventative medication, not a rescue inhaler". She also refilled plaintiff's Vicodin and Vioxx prescriptions. Plaintiff had x-rays of her lumbar spine which showed pars defects at L5 with spondylolisthesis first degree at L4-L5 (Tr. at 309).

On March 26, 2002, plaintiff was seen by a counselor at Comprehensive Mental Health Services (Tr. at 350). Plaintiff told the counselor she does not like to attend 12-step meetings

and she is cutting down on her drinking.

On April 9, 2002, plaintiff was seen by a counselor at Comprehensive Mental Health Services (Tr. at 349). The counselor noted that plaintiff said she had not attended any AA or NA meetings and does not want to. Plaintiff was reminded of the need to work the program, find a sponsor, keep appointments, and attend AA meetings. "Client is still drinking at this time."

On April 11, 2002, plaintiff had her second[10] Synvisc injection[11] in her knees (Tr. at 303).

On April 17, 2002, plaintiff saw Heather Hageman, M.D., at Truman Medical Center (Tr. at 299-300). She said she had received two of her three Synvisc injections in her knees, and it has been working a little better on the left knee. She had noticed no adverse effects from the Synvisc. Plaintiff was slightly more fatigued than usual, but had sore throat, bilateral ear pain, and cough. She continued to smoke about 1/2 pack of cigarettes per day, denied alcohol use over the last several months. Dr. Hageman diagnosed bilateral ear infection and bronchitis, bilateral degenerative joint disease of the knees, chronic obstructive pulmonary disease, and nicotine abuse. She prescribed an antibiotic, and "[a]gain, stressed the importance of

---

[10]This record refers to the injection as her second, but I have found no record of the first injection.

[11]One possible method for treating arthritis of the knee without performing surgery has been with an injectable medication called Synvisc. Hyaluronan, the name of the substance in Synvisc, is secreted by cells in the cartilage of joints. Hyaluronan is one of the major molecular components of joint fluid; and it gives the joint fluid (also called synovial fluid) its viscous, slippery quality. The high viscosity of synovial fluid allows for the cartilage surfaces of joints to glide upon each other in a smooth fashion. By injecting Synvisc in a knee, some people consider this a so-called joint lubrication.

28

discontinuation of nicotine use." Plaintiff had a chest x-ray which was normal (Tr. at 302).

On April 18, 2002, plaintiff saw Jason Datta, M.D., at Truman Medical Center, and had her third injection of Synvisc in her knees (Tr. at 297). She reported that she had been getting relief of her left knee pain but her right knee had acted up the previous night. "[S]he notices an improvement in both knees, left greater than right." Dr. Datta performed an examination and found full range of motion in the knees with some minimal pain in the right knee. "She has noticed improvement and decrease in the amount of pain medications she needs to take over the last three weeks with these injections. I had advised her that . . . she can take two Vioxx on the day that she has bad pain. I have advised her that she should not take two every day, but only when she really needs it."

On May 16, 2002, plaintiff received a letter from Comprehensive Mental Health Services which reads in part as follows: "Since your admission into the CMHS Outpatient Addiction Recovery Program, you have cancelled and/or received unexcused absences for individual sessions. When you were admitted into Addictions services, you read, signed and agreed to the Program Expectations, Right and Responsibilities. Non-compliance has consequences that affect one's status in the program. The above indicates non-compliance. You are dismissed unsuccessfully at this point in time per program expectations. In addition, unsuccessful dismissal means you are not eligible to return to this program for at least six months." (Tr. at 348).

On May 20, 2002, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental Health Services (Tr. at 343). Plaintiff had missed her last appointment, saying she had to go to court with her daughter. Dr. Edmisten noted that plaintiff should be out of her medications, but she

claims she had continued taking them. She had stopped taking Serzone on her own, and said she could not tell any difference. "[S]ame old stuff with my depression, still trying to look for a place to live, I did get Section 8, I'm not hearing voices. I last drank a beer on Mother's Day with my mother." Plaintiff denied marijuana use. She indicated her son kicked her out of the house because she did not get along with his girlfriend and tried to tell them out to raise their baby. She also wrecked her son's car. Her mental status exam with within normal limits. Plaintiff wanted to be on one pill. She stated that she needs the antidepressant, and Dr. Edmisten said she needed to stay on the Risperdal. "It may be that when she's using drugs, she loses touch with reality and hears voices and will take an antidepressant she says". Dr. Edmisten assessed dysthymia, history of substance abuse, alcohol dependence (active), marijuana dependence, rule out post traumatic stress disorder. Her GAF was assessed at 60. Dr. Edmisten prescribed Risperdal and Effexor XR.

On May 21, 2002, plaintiff saw Michael Williams, an addiction counselor with Comprehensive Mental Health Services (Tr. at 342). "Due to client's poor attendance in both groups, individual sessions and AA, client has been moved to another caseload, counselor to be named later."

On May 22, 2002, plaintiff saw Heather Hageman, M.D., at Truman Medical Center for a follow up on her knee and back pain (Tr. at 294-295). Plaintiff reported that she received the series of Synvisc injections in both knees with the last injection received the middle of April. The past two weeks, the pain had returned in her right knee although her left knee still felt good. Her pain was worse after prolonged sitting or activity. Plaintiff complained that her back pain

30

"seems to flare up." Plaintiff reported she was smoking a half a pack of cigarettes per day, had not had any alcohol for several months. Plaintiff's weight was 144 pounds. Her lungs were clear to auscultation bilaterally with no wheezes or crackles. Plaintiff had no back tenderness, full range of motion, and negative straight leg raising. Dr. Hageman assessed bilateral knee degenerative joint disease status post Synvisc series, and L4-L5 spondylolisthesis with persistent back pain. She recommended plaintiff follow up with Dr. Pickett as scheduled for her knees, and she refilled plaintiff's Vioxx and Vicodin prescriptions. She also referred plaintiff to a pain clinic for consideration of epidural injections. "As far as her chronic obstructive pulmonary disease goes she is probably due for pulmonary function tests. She has been on Serevent and Flovent in the past, but is now just on albuterol MDIs. She was not taking the Serevent and Flovent every day on a daily basis anyway." Plaintiff's liver enzymes "seem to be stable."

On August 6, 2002, plaintiff saw J. N. Teegarden, M.D., at Truman Medical Center (Tr. at 291-293). Plaintiff complained of chronic back and knee pain. She stated that she had been receiving injections in her knees at the pain clinic and that her left knee was significantly improved, but she continued to have pain in her right knee. She was treating her right knee pain with rest and taking Vioxx and Vicodin. Plaintiff also complained of having back pain. She had been receiving physical therapy for several weeks but did not think it was beneficial and did not provide relief of her back pain. Plaintiff had not been using one of her inhalers because she did not like the taste. She had not been using her Albuterol nebulizer machine. Plaintiff continued to smoke one pack of cigarettes per day. Dr. Teegarden noted a history of IV drug abuse, and wrote that plaintiff was a "recovering alcoholic". On exam, plaintiff's lungs were clear to

31

auscultation bilaterally. He assessed chronic obstructive pulmonary disease, stable; and Hepatitis C. Plaintiff was told to completely abstain from alcohol. Dr. Teegarden noted that plaintiff had one more physical therapy session for her back. He refilled plaintiff's Vioxx prescription but declined to refill her Vicodin.

On August 12, 2002, plaintiff saw Jack Edmisten, M.D., at Comprehensive Mental Health Services (Tr. at 340). "'We got problems, you don't want to see me.' By this she means the center does not want her seen and says 'I can't find a counselor, I've been doing so well on my drugs and alcohol, but I got a lot of other issues, things are going on in my life and I need to talk to someone. I'm in a custody battle with my grandbaby, I cant sleep well at night, I've been under a lot of stress, my son was busted.' All these are situational problems that the patient needs to learn to handle more realistically. She checked that she wanted to hurt someone else and I asked about this and she said 'I want to kill the baby's mother, I'm not going to. I was on drugs and alcohol when my kids were being raised.'" Plaintiff's mental status exam was within normal limits. She indicated she hears voices at times, but Dr. Edmisten noted that she was on Risperdal for that and it should help her handle that. He assessed Dysthymia, history of substance abuse, alcohol and marijuana dependence in partial remission, and rule out post traumatic stress disorder. Her GAF was 65. He prescribed Risperdal and Effexor.

On September 9, 2002, plaintiff saw J. N. Teegarden, M.D., at Truman Medical Center regarding her back pain and knee pain; however, the records are not legible (Tr. at 287-288).

On October 8, 2002, plaintiff was seen by Clinton Pickett, D.O., at Truman Medical Center (Tr. at 282). She complained of bilateral knee pain, right worse than left. "She had

Synvisc injections 5 months ago which greatly improved her left knee pain. However, right knee pain returned one month after the last injection." Plaintiff listed her medications as Estradiol, Vioxx, and Risperdal. She was smoking one pack of cigarettes per day, and had been a smoker for 32 years. "Past ethanol abuse. Presently abstaining, but drinks 6 beers a month." Dr. Pickett scheduled an arthroscopy of the right knee for October 31, 2002.

On October 31, 2002, plaintiff underwent a right knee arthroscopy at Truman Medical Center (Tr. at 262-281). She was sent home with a walker and a prescription for Vicodin.

On November 11, 2002, plaintiff saw Atta Butt, M.D., at Comprehensive Mental Health Services (Tr. at 338). "Has been off medications for over a month and is suspicious, paranoid, anxious, irritable, hyperverbal, hyperactive, has racing thoughts". Plaintiff did not report disassociative episodes or severe anger episodes. "Has used drugs (marijuana and meth) and alcohol excessively in the past, abused benzodiazepines. . . . [R]eports is not currently doing illicit drugs or alcohol." Dr. Butt assessed a GAF of 50, and started plaintiff on Risperdal, Gabitril, and Seroquel. On the questionnaire completed by plaintiff before her appointment, she reported using alcohol/drugs once per month and smoking one pack of cigarettes per day (Tr. at 339).

On December 9, 2002, plaintiff saw Atta Butt, M.D., at Comprehensive Mental Health Services (Tr. at 336). Plaintiff reported that Risperdal was decreasing the intensity and frequency of her auditory hallucinations, she reported she had not been losing touch with reality, was awake, alert and oriented with satisfactory grooming and hygiene. Her GAF was 50. Dr. Butt continued plaintiff on her current medications.

33

On December 20, 2002, plaintiff saw Christopher Chuinard, M.D., in the Truman Medical Center Orthopedic Clinic (Tr. at 261). Plaintiff stated that her right knee had been improving since her arthroscopy. She complained of some left shoulder pain. "She has no longer been taking her Vioxx and feels that this might be contributing to her increase in symptomatology. She does report some clicking and popping in the right knee and pain going up and down stairs but feels that it is not debilitating." Dr. Chuinard observed that plaintiff had full range of motion of both knees. He recommended she begin straight leg raise exercises and resume her Vioxx therapy, and he refilled her Vioxx prescription.

On February 3, 2003, plaintiff requested a refill of her Risperdal and indicated she was having no problems (Tr. at 324). The refill was approved.

On March 17, 2003, plaintiff saw Atta Butt, M.D., at Comprehensive Mental Health Services (Tr. at 334). Plaintiff was observed to be awake, alert, oriented with satisfactory grooming and hygiene. Plaintiff denied any active psychotic problems. She was noted as being compliant with her medications. Her GAF was 50. She was continued on her current medications.

On April 3, 2003, plaintiff had x-rays of her left shoulder due to left shoulder pain without history of trauma, "apparently had left shoulder surgery 15 years ago." (Tr. at 417). The x-rays showed no evidence of dislocation or separation. "[P]osttraumatic or postsurgical changes were noted involving the distal left clavicle, however, no destructive lesion or acute fraction was identified."

On July 2, 2003, plaintiff saw Cindy Ruttan, D.O., at Comprehensive Mental Health Services (Tr. at 331). "Reports she has been noncompliant with medications since April, states that she went off medication because she didn't have a very good sexual desire. . . . Per chart review, patient has discontinued her medications before without discussing it with the clinicians. She even reports she's discontinued taking her Estrogen". Dr. Ruttan assessed plaintiff's GAF at 55-60. She started plaintiff on Zoloft and recommended individual therapy. In the questionnaire plaintiff completed before her visit, she reported smoking one pack of cigarettes per day, but left blank the question about alcohol usage (Tr. at 332).

On July 30, 2003, plaintiff saw Cindy Ruttan, D.O., at Comprehensive Mental Health Services (Tr. at 329). Plaintiff reported that she had not followed up with baseline blood work but said she felt better and was much more stable with her moods. She described her mood as an 8, she also reported her pain was an 8 that day. Plaintiff's GAF was 60. Dr. Ruttan continued plaintiff on her same medication. On the questionnaire completed by plaintiff before her visit, she reported smoking one pack of cigarettes per day (Tr. at 330).

On August 1, 2003, plaintiff's liver function tests were normal (Tr. at 327).

On August 4, 2003, plaintiff was seen at UHS Family Care Center (Tr. at 364). She complained of pain in her upper back and shoulders for the past two weeks. Plaintiff was assessed with lower back pain and was prescribed Celebrex and Flexeril. She was told to follow up at GI for her Hepatitis C, and was referred for lumbar spine x-rays.

On September 8, 2003, plaintiff was seen at UHS Family Care Center (Tr. at 357). She complained of back pain and right knee pain for the past month. She had no respiratory

35

complaints, no psychological complaints (headache, depressed, anxious, insomnia, stressed out).
Plaintiff refused to follow up with GI about her Hepatitis C. Plaintiff had x-rays of her lumbar
spine which showed moderate degenerative change at L1-2 with moderate to severe arthrosis at
L4-5 and L5-S1 (Tr. at 359, 412).

On September 24, 2003, plaintiff was seen by Cindy Ruttan, D.O., at Comprehensive
Mental Health Services (Tr. at 325). Plaintiff reported that the increased Zoloft made her feel
better. She also stated that taking care of her granddaughter improved her depression. Plaintiff's
GAF was assessed at 65.

On September 25, 2003, plaintiff had an appointment at Comprehensive Mental Health
Services, but did not show up (Tr. at 324).

On October 8, 2003, plaintiff had an MRI of her low back (Tr. at 355). The impression
was listed as follows:

1.      Degenerative disc disease at L1-L2, L4-L5 and at L5-S1.

2.      Slight anterolisthesis of L4 on L5 is present causing some slight bilateral foraminal
        narrowing but no evidence of central stenosis.

3.      Bulging of the disc at L1-L2 without definite stenosis.

4.      Bulging of the disc at L5-S1 in association with facet arthropathy and slight
        bilateral foraminal narrowing, left greater than right. There is no central stenosis.

5.      This is very similar to the prior report dated 6/6/02.

On October 27, 2003, plaintiff had an epidural steroid injection in her back (Tr. at 400).

On November 5, 2003, plaintiff had an epidural steroid injection in her back (Tr. at 393).

On November 18, 2003, plaintiff had an epidural steroid injection in her back and was prescribed physical therapy twice a week for six weeks (Tr. at 385).

## C. SUMMARY OF TESTIMONY

During the January 13, 2004, hearing, plaintiff testified; and Marianne Lumpe, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 49 years of age and is currently 52 (Tr. at 30). She has a tenth grade education (Tr. at 31). Plaintiff attempted to take the GED test several times but was unsuccessful (Tr. at 31). She is 5' 6" tall and weighs about 130 pounds (Tr. at 31).

Plaintiff's right knee constantly hurts (Tr. at 38). Plaintiff's knee hurts when she sits down and tries to stand back up (Tr. at 39). Walking, climbing stairs, standing for a long time, and cold air also make her knee pain worse (Tr. at 39). Plaintiff cannot kneel or stoop because of her knee (Tr. at 39). For relief of knee pain, plaintiff elevates her leg and sometimes uses a heating pad (Tr. at 39). She elevates her leg a few times a day, every time she is sitting or lying (Tr. at 39-40). Plaintiff's doctor told her to elevate her leg, but it does not really help that much, just some (Tr. at 40, 66). Plaintiff has had injections in her knee which were helpful only for a day or so (Tr. at 40). Plaintiff had physical therapy six months to a year before the hearing, and it was not helpful (Tr. at 40-41). Plaintiff has a walker that her doctor gave her but she never uses it because it embarrasses her (Tr. at 41). She gets around her apartment OK, and when she goes shopping she just leans on the cart (Tr. at 42). Plaintiff had two surgeries on her knee (Tr. at 42). They were helpful for a couple of months (Tr. at 42). Her doctor wants to wait until she

37

turns 50 and then do a knee replacement (Tr. at 42).

Plaintiff suffers from back pain all the time (Tr. at 43). Standing for very long, sitting for very long, and cold weather make her back pain worse (Tr. at 43). It hurts to bend, it hurts to twist (Tr. at 43-44). For relief of back pain, plaintiff lies on her stomach or sometimes sits in the bath tub (Tr. at 44). Plaintiff takes medication for her back, but it does not help (Tr. at 44). She has had shots in her back, but they were helpful only for about a day (Tr. at 44). Plaintiff has had physical therapy but it has not helped her back (Tr. at 44). Plaintiff lies down for about 15 minutes to an hour two to three times a day to help her back pain (Tr. at 45).

Plaintiff has chronic obstructive pulmonary disease (Tr. at 45). She uses an inhaler every day (Tr. at 45). Going up stairs, talking too much, and the weather make plaintiff's shortness of breath worse (Tr. at 45). Cleaning supplies also make her COPD symptoms worse (Tr. at 46). Plaintiff has been smoking since she was about 15 (Tr. at 60). At the time of the hearing, she was smoking not quite a pack a day (Tr. at 60).

Plaintiff has been diagnosed with Hepatitis C (Tr. at 46). Her doctors are talking about Interferon therapy, and she has an appointment with a specialist in the next month (Tr. at 46). She has not taken any medication for that condition (Tr. at 58). Plaintiff is tired because of the Hepatitis C, and she sleeps a lot (Tr. at 47). She sleeps 10 to 13 hours each night, and then she naps during the day (Tr. at 47).

Plaintiff believes she can sit for 15 to 30 minutes before needing to get up (Tr. at 48). Plaintiff can stand long enough to do the dishes, about 15 minutes (Tr. at 49). Plaintiff believes she could walk about a block (Tr. at 49). She can lift a gallon of milk (Tr. at 50).

38

Plaintiff has been seeing her psychiatrist since 1980 (Tr. at 50-51). She takes her psychiatric medication as directed (Tr. at 51). Plaintiff has depression and anxiety, and she goes to a counselor about once every two or three weeks for an hour (Tr. at 51, 64). She has brief crying spells almost every day (Tr. at 65). Her medications make her tired (Tr. at 51-52). Plaintiff does not like to be around people (Tr. at 53). She does not think she could ride a bus because of the people looking at her (Tr. at 53). Plaintiff stays at home a lot, but she has a girl friend who comes over to visit about once a week (Tr. at 54). She also has a girl friend who lives in her apartment building (Tr. at 54). Plaintiff goes out to go to the store, to the doctor, or to her sister's house (Tr. at 54). Plaintiff takes care of her plants and watches half-hour sitcoms on television (tr. at 55).

Plaintiff lives alone and does her own housework without problems (Tr. at 55-56). Plaintiff has a history of alcohol abuse, but she has been sober for 18 or 19 months (Tr. at 56). Plaintiff also had a problem with marijuana (Tr. at 57). She was in drug rehab in the 1980's (Tr. at 57). Plaintiff last used marijuana about 18 months ago (Tr. at 57).

2.    **Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of the Administrative Law Judge. The first hypothetical involved a person with a tenth grade education but with reading skills at the third or fourth grade level. The person could perform the full range of sedentary work but because of psychological problems she would need to be in a low stress, non-complex, simple routine with no fixed quotas. She would need to be in a clean environment free of obnoxious odors. She would need to have limited contact with the consuming public, no

supervisory responsibilities, no fine dexterity with the right hand, and must be able to sit or stand at will (Tr. at 68-69).

The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 69). The person could, however, be a surveillance system monitor, D.O.T. 379.367-010, with 750 to 800 in the state and about 75,000 to 76,000 in the country (Tr. at 71).

The second hypothetical was the same as the first but added the limitation that the person would have moderate difficulties in maintaining concentration, persistence, or pace (Tr. at 71). The vocational expert testified that such a person could not perform that job (Tr. at 72).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge William Horne entered his opinion on January 24, 2004. The ALJ noted that plaintiff's last insured date is June 30, 2003 (Tr. at 19).

The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 19). He found that plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine, history of hepatitis C, bilateral knee degenerative joint disease, status post two arthroscopic surgeries to the right knee, chronic obstructive pulmonary disease secondary to tobacco abuse, a depressive disorder, a borderline personality disorder, and a history of substance abuse in alleged remission (Tr. at 19). The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19-20).

After analyzing plaintiff's credibility, he found that her subjective allegations were not entirely credible (Tr. at 20-22). He then analyzed the medical records and determined that plaintiff retains the residual functional capacity to perform sedentary work with a sit/stand option

40

involving only low stress, non-complex tasks, i.e., only simple, repetitive job tasks with no fixed quotas required, and only limited contact with the general public, supervisors and co-workers, and no supervisory responsibilities. Plaintiff would require a relatively clean environment. "Giving claimant every benefit of the doubt, with respect to her alleged right upper extremity problems, she would be precluded from work involving fine dexterity with the right upper extremity." (Tr. at 24-25).

The ALJ found that with this residual functional capacity, plaintiff could not return to her past relevant work (Tr. at 25). However, she could perform the job of surveillance systems monitor, Dictionary of Occupational Titles number 379.367-010, with 750 to 800 jobs in Missouri and 75,000 to 76,000 jobs in the United States (Tr. at 25).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir.

41

1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [C]laimant has had a very sporadic work history with minimal to no earnings for many years, suggesting a questionable motivation to work on her part. In terms of daily activities, claimant testified that she lived alone, and performed her own household chores. Later in her testimony, she noted that her daughter assisted her with some of the chores. Nonetheless, claimant stated that she was able to go to the grocery store, and did not use an assistive device for ambulation while she shopped. Hobbies included caring for house plants, and claimant also noted that she enjoyed watching weekly sitcoms on television. Social activities included visiting with her girlfriend, whom claimant noted visited her about once a week.
>
> On an activities questionnaire completed during the period in question, claimant reported that she had no problems caring for her personal needs such as grooming, dressing, cleaning, etc. Household chores, according to the questionnaire, included cooking and house cleaning. Herein, claimant noted the following: "I keep a OK house."

42

Social activities includ[ed] going to a friend's home "often," and claimant also noted that she went to her mother's or sister's home "sometimes." Herein, she noted no problems or difficulties leaving her home or being away from home.

\* \* \* \* \*

Overall, the undersigned finds that claimant's activities are inconsistent with her allegations of debilitating orthopedic pain and severe emotional problems. . . .

Although claimant testified to severe mental symptoms including crying spells and auditory hallucinations, it is noted that she has undergone very sporadic mental treatment during the period in question. Moreover, she has not been psychiatrically hospitalized for any alleged mental complaints during said period. . . .

The undersigned further notes there are issues of non-compliance on the part of claimant, with respect to smoking cessation, and not taking her medications as prescribed. Specifically, treatment records from Comprehensive Mental Health Services have indicated that claimant is non compliant with respect to her medications. Reference is also made to the November 2002 clinic note which showed that claimant had been off her medications for over a month, and was experiencing symptoms such as paranoia, irritability, anxiousness, etc. Treatment records for May 2002 further showed that claimant had stopped Serzone on her own. In July 2003, Cindy Ruttan, D.O., reported that claimant had been non compliant with medications since April 2003, stating that she had gone off medication because she didn't have a very good sexual desire. It is further noted that although claimant has a diagnosis of COPD, and doctors have recommended to her that she cease smoking, claimant continues to smoke, according to the record and testimony.

(Tr. at 20-22).

1.  *PRIOR WORK RECORD*

The ALJ noted that plaintiff has a very sporadic work history with minimal to no earnings for many years, suggesting a questionable motivation to work. Plaintiff's earnings record shows 14 years with no earnings, six years with less than $1,000 annual earnings, five more years with less than $2,000 annual earnings. This factor supports the ALJ's credibility decision.

43

## 2.     DAILY ACTIVITIES

Plaintiff told her counselor, Ms. Fritzsch, that she is the one who picks up after her son's girl friend and the girl friend's toddler, and that she does the cooking for them.  She also said that she feels she owes it to her grown son to do his laundry, clean the house, and cook his meals. Plaintiff testified that at the time of the hearing she was living alone and she was doing her own housework without problems. Plaintiff's daily activities are inconsistent with total disability.

## 3.     DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In April 2001, plaintiff's back pain was described as not throbbing and not bad enough to keep her up at night.  Plaintiff consistently rated her pain almost as bad as it can get; however, the records show that her ratings were exaggerated.  For example, on October 24, 2001, plaintiff rated her pain a nine out of ten; however, she also told the doctor that she had been feeling rather well for the past month and a half.  The doctor found only mild tenderness in plaintiff's back, mild pain with back flexion and extension, and full range of motion.  Nothing in those notes is consistent with plaintiff's pain being a nine out of ten.  Similarly, in January 2002, plaintiff rated her back pain, neck pain, and knee pain a ten out of ten, yet she was observed to be pleasant and in no acute distress.

In May 2002, plaintiff reported that her left knee still felt good since her Synvisc injections, and that her back pain "seemed to flare up", not a description of constant pain. Plaintiff at that time had no back tenderness, full range of motion, and negative straight leg raising.  In December 2002, plaintiff reported right knee pain going up and down stairs but said it was not debilitating.

44

In September 2003, while being seen for her back and knee, plaintiff reported that she had no psychological complaints, including no complaints of headache, depression, anxiety, insomnia, or stress.

During the hearing, plaintiff testified that she is tired because of her Hepatitis C; however, the medical records include no symptoms of Hepatitis C and although plaintiff did test positive for the disease, her liver function tests were normal and she was never treated for Hepatitis.

The substantial evidence in the record on this factor supports the ALJ's credibility conclusion.

**4.    PRECIPITATING AND AGGRAVATING FACTORS**

Plaintiff's back pain, according to Dr. Hageman's March 2001 notes, improved when plaintiff drank more fluids and worsened when drinking caffeine and coffee.  In April 2001, she reported that nothing specific increased or lessened her back pain.  In September 2001, plaintiff reported that her back pain was worse after lying in bed for prolonged periods of time or on days when she is very active and lifting a lot.

Plaintiff testified at the hearing that walking, climbing stairs, standing for a long time, and cold air make her knee pain worse; however, the only reference in the medical records supporting these complaints is her statement that going up and down stairs causes pain but not debilitating pain, and that was before her knee surgery.  There are no complaints to any doctors that standing or walking increase her pain.

Plaintiff was noted often to continue using alcohol despite her Hepatitis C. In February 2001, she complained of serious problems with depression, crying, insomnia, poor appetite, irritability, mood swings and panic. She then reported having recently consumed 12 beers. Dr. Edmisten noted in August 2001 that plaintiff reported seeing ghosts and hearing her daughter talk when her daughter was not there, but he then noted that she was still withdrawing from alcohol and he did not believe she was experiencing psychotic symptoms. In May 2002, Dr. Edmisten noted that plaintiff's use of drugs causes her to lose touch with reality and hear voices.

Nearly all of the precipitating and aggravating factors in the record are situational stressors and are not related to plaintiff's impairments. For example, she reported increased symptoms or consuming alcohol and drugs after her mother's heart attack, when people came to her house with alcohol, when she argued with her boy friend, when she was evicted from her home, when her son and his girl friend argued, when she was homeless, when her daughter used drugs, when her son was on probation, when she drank and used marijuana and Valium, when she worried about eviction and her utilities being shut off, when her daughter was rude to her boy friend, when her boy friend "pissed her off", when her cousin committed suicide, when she was engaged in a custody battle involving her grandchild. Nearly all of these aggravating factors are situational and most deal with plaintiff's continued use of alcohol and drugs.

This factor supports the ALJ's credibility determination.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

In January 2001, plaintiff reported that she resumed taking her estrogen and believed it was helping to regulate her moods. Plaintiff told Ms. Fritzsch that antidepressants were helpful

46

and that her moods had been more stable. In August 2001, Dr. Edmisten continued plaintiff on her same medications despite having a GAF of 50 and despite plaintiff's continued use of alcohol, indicating he believed the medications were working just fine. In September 2001, plaintiff told Dr. Edmisten that she felt her medications were working. He again continued her on her same medications with a GAF of 60. In November 2002, plaintiff stopped taking her medications for over a month and then was noted to be suspicious, paranoid, anxious, irritable, hyperverbal, hyperactive, and having racing thoughts. Those symptoms were not present when plaintiff took her medication as prescribed. By the next month, plaintiff was back on her medications and she reported a decrease in the intensity and frequency of her auditory hallucinations, and Dr. Butt continued her on her same medications despite a current GAF of 50, indicating he was pleased with the effects of the medications. By February 2003 when plaintiff requested a refill of Risperdal, she said she was having no problems. A month later, plaintiff was noted to be compliant with her medications. She was observed to be awake, alert, and oriented with satisfactory grooming and hygiene, and she denied any psychotic problems. In July 2003, plaintiff reported stable moods. In September 2003, she reported that Zoloft made her feel better.

Plaintiff told Dr. Hageman that Serzone was helping her sleep at night.

Plaintiff told Dr. Hageman that her breathing was stable with her Albuterol inhalers despite her continued smoking.

Plaintiff told Dr. Hageman in March 2002 that if she does not take Vioxx, her knees hurt and swell, which indicates the Vioxx was working to control knee pain and swelling when plaintiff used it as prescribed.

47

Plaintiff reported no adverse side effects from Synvisc. After receiving the Synvisc injections, she reported improvement in both knees and a decrease in the amount of pain medications she needed to take. Plaintiff testified during the hearing that her medications made her tired; however, there is no complaint in the medical records of that alleged side effect.

By October 2002, plaintiff was only taking estrogen, Risperdal (for auditory hallucinations) and Vioxx, a non-steroidal anti-inflammatory.

Based on the above medical records, I find that this factor supports the ALJ's credibility determination.

## 6. FUNCTIONAL RESTRICTIONS

The record is almost devoid of functional restrictions. In fact, plaintiff was told to do abdominal strengthening exercises, quad strengthening exercises, and straight leg raise exercises. Dr. Blesinger, a consulting physician, found that plaintiff could occasionally lift 20 pounds and frequently lift ten pounds; could stand, walk, or sit for six hours per day; had an unlimited ability to push or pull; could occasionally climb, balance, stoop, kneel, crouch, or crawl; had no manipulative, visual, or communicative limitations; and had no environmental limitations except that she should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and vibration. Dr. Isbenberg found that plaintiff's only mental limitations were moderate limitations in the ability to carry out detailed instructions, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. He further found, after concluding that the above three limitations were the only ones, that plaintiff would

48

have moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.

Again, I find that this factor supports the ALJ's credibility conclusion.

**B.** **_CREDIBILITY CONCLUSION_**

In addition to the above <u>Polaski</u> factors, there are other indications in the record that plaintiff's subjective complaints of disability are exaggerated. On January 3, 2001, she reported that her last alcohol drink had been on New Year's Eve, but three weeks later she said her last drink had been on Christmas Eve. Plaintiff testified that her doctor told her to elevate her leg, but there is nothing in any medical record indicating that any doctor recommended plaintiff elevate her leg. Plaintiff testified that the knee injections were only helpful for a day or so, but the medical records indicate that months after the injections plaintiff was still reporting that her knee "felt good." Plaintiff testified that she does not use her walker because it embarrasses her, which indicates her allegations of severe pain are exaggerated.

Plaintiff has a history of noncompliance. In November 2000, she reported she had not been using her inhaler or nebulizer because she ran out; yet, she continued smoking cigarettes. In January 2001, she reported that she had stopped taking her Serzone. In January 2001, plaintiff stopped taking her Serzone because of diarrhea even though she was told Serzone does not cause diarrhea. In addition, plaintiff had stopped taking her estrogen. In March 2001, plaintiff reported an increased use of marijuana. She told her counselor that she was continuing to drink beer and that she would smoke marijuana as often as she could if she had access to it. She was smoking marijuana a couple times a week then. In October 2001, Dr. Edmisten noted that

49

plaintiff was not taking her medications as prescribed or she would have run out by then. In January 2002, plaintiff was still using alcohol. In May 2002, Dr. Hageman noted that plaintiff was not taking her Serevent or Flovent every day as prescribed. In August 2002, Dr. Teegarden noted that plaintiff had not been using her inhaler because she did not like the taste, and she was not using her Albuterol nebulizer machine, yet she continued to smoke.

In March 2001, plaintiff went to Comprehensive Mental Health Services for her appointment but left before being seen. The next week, she noted she had canceled her previous sessions because she had been under a lot of stress lately. In October 2001, plaintiff failed to show up for her appointment at Comprehensive Mental Health Services. In March 2002, she told her counselor she does not like to attend 12-step meetings, and the next month she said she had not attended any AA or NA meetings and did not want to. She was told to work the program, find a sponsor, keep her appointments, and attend AA meetings. Plaintiff was still using alcohol at that time. In May 2002, plaintiff was dismissed from the outpatient addiction recovery program due to noncompliance. The following week, she told her psychiatrist that she missed her last appointment because she went to court with her daughter. Dr. Edmisten observed that plaintiff should be out of her medications but was not, an indication that she was not taking them as prescribed. The end of May 2002, plaintiff reported that she drank beer on mother's day. On May 21, 2002, plaintiff was moved to another counselor at Comprehensive Mental Health Services due to poor attendance in groups, individual sessions, and AA. In October 2002, plaintiff reported drinking about six beers a month. In December 2002, plaintiff reported that she was no longer using her Vioxx and thought this might be making her symptoms

50

worse.  In July 2003, Dr. Ruttan noted that plaintiff had been noncompliant with her medications since the previous April, and noted that plaintiff's excuse for stopping her medications was a decreased sex drive.  Plaintiff had even stopped taking her estrogen.  In July 2003 plaintiff reported that she had failed to follow up with her baseline blood work.  In September 2003 plaintiff refused to follow up with GI about her Hepatitis C.  In September 2003 she failed to show up for her appointment at Comprehensive Mental Health Services.

Plaintiff continued to smoke cigarettes regularly despite suffering from chronic obstructive pulmonary disease and despite being warned repeatedly by her doctors to stop smoking.  In November 2000 Dr. Hageman "again stressed the importance of smoking cessation." In December 2000, her GI doctor "strongly advised" her to quit smoking and quit using alcohol. In January 2001, Dr. Hageman "again readdressed the smoking problem".  In February 2001, Dr. Hageman "again explained the importance of stopping smoking".  In April 2001, Dr. Hageman "stressed the importance of discontinuing smoking."  In September 2001, Dr. Hageman "stressed the importance of stopping smoking and complete cessation of alcohol."  In October 2001, Dr. Hageman "stressed the importance of discontinuation of nicotine abuse."  In December 2001, Dr. Hageman again told plaintiff to stop smoking.  In January 2002, Dr. Hageman encouraged plaintiff to stop smoking.  In April 2002, Dr. Hageman again told plaintiff to stop smoking.  At the time of the administrative hearing, plaintiff was still a smoker.

A majority of the time, plaintiff's medical tests were normal.  Chest x-rays taken in November 2000 were normal.  In December 2000, her gait and station were normal.  In January 2001, she had no paraspinous muscle spasms or swelling.  Her COPD was noted as stable.  In

51

February 2001, her COPD was again noted as stable.  In March 2001 COPD was stable.  Her lungs were clear with no crackles or wheezes in September 2001 despite continued smoking. COPD was stable in October 2001.  In April 2002, her chest x-rays were normal.  Her COPD was stable in August 2002.

In September 2001 plaintiff had no tenderness in her back and full range of motion in her hips.  In October 2001, plaintiff had only mild tenderness to palpation in the sacroiliac area and full range of motion in her hips.  She had only mild pain with extension and flexion of her back. Her liver function tests were normal.  Her Hepatitis was grade 1 stage 1 indicating only minimal inflammation and minimal scarring.  In April 2002, she had full range of motion in her knees with only  minimal pain in the right knee.  In May 2002, plaintiff had no back tenderness, full range of motion, and negative straight leg raising.  In May 2002, plaintiff's liver enzymes were stable.  In December 2002, plaintiff had full range of motion in her knees.  In April 2003, she had only postsurgical changes in her shoulder with no destructive lesion or acute fracture identified. In August 2003, plaintiff's liver function tests were normal.  In October 2003 she had an MRI of her low back which was "very similar" to her previous report 14 months earlier.

Plaintiff's mental status exams were normal in August 2001, September 2001, October 2001, January 2002, and in August 2002.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations of disabling pain and mental symptoms are not credible.  Therefore, her motion for summary judgment on this basis will be denied.

52

## VII.    HYPOTHETICAL

Plaintiff argues that the ALJ's residual functional capacity finding was not included in the hypothetical to the vocational expert.  Specifically, plaintiff states that the ALJ found she had a moderate degree of limitation with respect to maintaining concentration, persistence or pace, but did not ask the vocational expert whether an individual with these moderate difficulties could perform work activity.

> The hypothetical posed to the VE, in relevant part, stated, "Because of the psychological problems she has, we're going to put in a low stress, non-complex, simple routine with no fixed quotas" and, "She's to have limited contact with the consuming public, and no supervisory responsibilities."  (Tr. 68-69)  Based upon the hypothetical limitations given by the ALJ, including the psychological limitations, the VE testified plaintiff could perform the work of a surveillance system monitor, although her job opportunities were "extremely limited". (Tr. 70)
>
> * * * * *
>
> The ALJ's hypothetical to the VE did not specifically ask whether an individual with moderate difficulties in social functioning and concentration, persistence and pace could perform work activity. (Tr. 68-69)  When asked by plaintiff's counsel whether an individual with the same limitations described by the ALJ, but who also had moderate difficulties in maintaining concentration, persistence and pace, defined as greater than one-third of the work day, could perform the job of surveillance system monitor, the VE responded, "No, if they were off task up to a third or more than one-third of a day, they would not be able to perform that job." (Tr. 71-72)

(Plaintiff's brief at 29-30).

As defendant points out, there is no authority for defining "moderate" as being unable to concentrate for one-third of the eight-hour workday.  The ALJ is not required to use any specific language in the hypothetical question as long as he captures the concrete consequences of plaintiff's impairments.  Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000); Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  In Roe v. Chater, 92 F.3d 672, 676-77 (8th Cir.

53

1996), the hypothetical was found proper even though it did not specifically state that the claimant often had deficiencies in concentration, persistence, and pace, because it included the mental conditions that caused the deficiencies and the concrete consequences that flowed from them, i.e., that the claimant was not capable of work requiring constant, close attention to detail, he required occasional supervision, and he was not capable of work at more than a regular pace.

I also note here that the "extremely limited" job opportunities discussed by the vocational expert were "extremely limited" not because of plaintiff's mental impairment, but because of her alleged carpal tunnel syndrome in her dominant hand. The ALJ gave plaintiff "every benefit of the doubt, with respect to her alleged right upper extremity problems" and found that she would be precluded from work involving fine dexterity with the right upper extremity. However, this benefit of the doubt is not supported by the evidence. The only reference in the 424-page record to plaintiff's right wrist occurred on November 27, 2000, when Dr. Stanley wrote "plaintiff reported that she had previously had carpal tunnel surgery on her right wrist." (Tr. at 223). There is no evidence that plaintiff ever suffered from carpal tunnel syndrome, there is no evidence that she ever had surgery for carpal tunnel syndrome, there is not one complaint in all of these medical records of any problems with her right wrist, there is not one test or finding with respect to her right wrist. Even giving plaintiff this great benefit of the doubt, plaintiff was still found not disabled. And it appears from these records that her job opportunities are in reality not as limited as it appears from the findings because of the complete lack of any evidence that plaintiff's right hand fine dexterity is limited at all.

54

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff could perform the work of surveillance system monitor based on plaintiff's mental residual functional capacity. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII.   FINDING THAT PLAINTIFF COULD PERFORM OTHER WORK

Plaintiff argues that the evidence does not support the ALJ's finding that she could perform the work of a surveillance system monitor. She argues that that position requires the ability to read and write at greater skill levels than those possessed by plaintiff, and that the vocational expert's testimony in that respect differed from the Dictionary of Occupational Titles.

As the defendant points out, there is no evidence in the record other than plaintiff's own testimony that her reading skills are as low as alleged. Plaintiff testified that although she has a tenth grade education, she does not read because she does not recognize many words. The Dictionary of Occupational Titles states that a surveillance monitor must be capable of reading novels, magazines, and encyclopedias; must be able to read safety rules and instruction manuals; must have the skills to write reports and essays with proper format, punctuation, spelling, grammar, and using all parts of speech; be able to speak before an audience with poise, voice control, confidence, and proper English.

The ALJ's residual functional capacity assessment does not address a limitation in plaintiff's ability to read, write, or speak in public (Tr. at 24-25). Therefore, there is no finding by the ALJ that plaintiff is limited to reading at the third or fourth grade level. However, his only hypothetical to the vocational expert assumed "reading at the third or fourth grade level, I

would surmise." (Tr. at 68). Based on that hypothetical which included the reading limitation, the vocational expert testified that such a person could be a surveillance system monitor, and the ALJ found that the only job a person with the limitations found by the ALJ could perform would be a surveillance system monitor (again, the job opportunities were significantly limited due to the right wrist limitation, not due to the reading limitation; however, the reading limitation was a factor in the hypothetical relied on by the ALJ). Clearly there is a conflict between the testimony of the vocational expert and the Dictionary of Occupational Titles.

In the Eighth Circuit, when expert testimony conflicts with the Dictionary of Occupational Titles, the Dictionary of Occupational Titles controls. Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995), citing Campbell v. Bowen, 822 F.2d 1518, 1523 n. 3 (10th Cir. 1987); Tom v. Heckler, 779 F.2d 1250, 1255 (7th Cir. 1985); Mimms v. Heckler, 750 F.2d 180, 186 (2nd Cir. 1984); McCoy v. Schweiker, 683 F.2d 1138, 1145-46 (8th Cir. 1982) (stating that "in the general run of cases" the DOT is more reliable than a vocational expert). The Dictionary of Occupational Titles classifications may be rebutted, however, with vocational expert testimony which shows that particular jobs may be ones that a claimant can perform. Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995), citing Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). Here, there was no vocational expert testimony discussing the ability to perform the surveillance system monitor job with a third or fourth grade reading level despite the reading requirements listed in the Dictionary of Occupational Titles for this specific job.

The vocational expert's task "is to determine whether jobs exist for someone with the claimant's precise disabilities." Montgomery v. Chater, 69 F.3d at 277, quoting Jelinek v. Brown,

870 F.2d 457, 459 (8th Cir. 1989). She failed to accomplish that task in this case, and the Commissioner may not rely on her testimony. As a consequence, the Commissioner has not met his burden of demonstrating that jobs exist in the economy which plaintiff is capable of performing. Because there is no credible evidence that plaintiff's reading skills are limited to the third or fourth grade level, had the ALJ asked the vocational expert a hypothetical question that did not include that reading limitation, presumably the vocational expert would have testified that the person could perform the surveillance system monitor job and the ALJ's finding would be upheld. However, as discussed above, the only hypothetical the ALJ asked included the reading limitation which conflicts with the Dictionary of Occupational Titles and therefore cannot be relied on to find plaintiff not disabled.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations are not credible, and supports the ALJ's finding that plaintiff has the mental residual functional capacity to perform the surveillance system monitor job. However, I further find that the hypothetical relied on by the ALJ is insufficient as it included a limitation that plaintiff's reading skills are limited to the third or fourth grade level (even though the ALJ had not made such a finding in determining plaintiff's residual functional capacity), and the vocational expert's testimony differed from the requirements set forth in the Dictionary of Occupational Titles. Therefore, it is

ORDERED that the decision of the Commissioner is reversed pursuant to Sentence Four and this case is remanded to the Commissioner for reconsideration consistent with this opinion.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 20, 2007